UNITED STATES DISTRICT COURT
WETERN DISTRICT OF NEW YORK

---

ANGELO MEDORI,

                              Plaintiff,

v.                                                          Case No. 13-CV-6408-FPG

                                                            DECISION & ORDER

CAROLYN W. COLVIN,
Acting Commissioner of Social Security
Administration of the United States,

                              Defendant.

---

## I.    INTRODUCTION

Angelo Medori ("Plaintiff"), by his attorney, Richard A. Goldberg, Esq., brings this action pursuant to Title XVI of the Social Security Act ("SSA"), seeking review of the final decision of the Commissioner of Social Security ("Commissioner"), which denied his application for Supplemental Security Income ("SSI").  ECF No. 1.  The Court has jurisdiction over this matter under 42 U.S.C. §§ 405(g) and 1383(c)(3).

Before the Court, currently, are the Motions for Judgment on the Pleadings filed by both parties pursuant to Federal Rules of Civil Procedure 12(c).  ECF Nos.11, 12.  For the reasons set forth herein below, I find that the final decision of the Commissioner is supported by substantial evidence within the record[1] and accords with applicable legal standards.  Therefore, I grant the Commissioner's Motion for Judgment on the Pleadings, deny Plaintiff's Motion for Judgment on the Pleadings, and order that the Complaint be dismissed.

---

[1] All references to the Administrative Record are reflected herein as ("R."), along with the associated page number(s).

## II.    BACKGROUND

### A.  Procedural History

Plaintiff filed an application for SSI on March 31, 2010, alleging that he was disabled, and his disability began on October 1, 2009. R. 137-41.  The Social Security Administrator denied his application for benefits on July 7, 2010 and, on November 30, 2011, Administrative Law Judge Brian Kane ("ALJ") determined, following a hearing held on October 13, 2011 at which Plaintiff appeared with his attorney and testified, that Plaintiff had not been under a disability since the date the application was filed. R. 6-16.  Thereafter, on June 7, 2013, the Appeals Council affirmed the decision of the ALJ, and the decision of the ALJ became the final decision of the Commissioner when the Appeals Council declined to assume jurisdiction.  R. 1-3.  Subsequently, on August 7, 2013, Plaintiff timely commenced this action in the United States District Court for the Western District of New York seeking review of the Commissioner's decision (ECF No. 1) and, on August 22, 2013, by his attorney, filed an Amended Complaint  (ECF No. 5).

### B.  Factual Background

Plaintiff, born on April 27, 1961, was 48 years old at the time he protectively applied for SSI benefits and had reached age 50 at the time of the administrative hearing.  R. 23-24.  While he dropped out of high school in the middle of the tenth grade, subsequently, in 1979, he obtained a GED.  R. 34-35.

Plaintiff testified that he last worked in August 2010 at a side painting job; he stopped working because he finished the job.  R. 30-33.  Plaintiff testified that after he suffered a stroke in 2008 or 2009, he had trouble getting work and new customers; he moved in with his mother a couple of years ago.  R. 32-33.  During the 1990s he worked as a mason's helper/laborer, but

worked full-time as a painter since the mid-1990s.  R. 33.  Regarding the effects from the stroke, Plaintiff testified that he had memory problems consisting of putting something down and forgetting where he put it two minutes later.  R. 34.

Plaintiff testified that painting jobs required lifting ladders weighing more than 10 pounds, and planks.  R. 31, 35.  He stated that since the stroke, he also had difficulty with hand coordination—occasionally dropping objects, such as a thrown football.  R. 35, 43.  Plaintiff described the medications he took as a result of the stroke, and heart condition, but stated he was not taking any medication now because he could not afford it, having no insurance, and having been rejected by Medicaid based upon some issue, he believed, related to his divorce.  R. 36-39.  Plaintiff stated that he last applied for Medicaid two months ago.[2]  R. 36-37.  He had not gone to a doctor since 2010, so as to avoid more debt.  R. 38.

Plaintiff described the medications being taken when he was under medical care as: Lipitor for cholesterol; Atenolol for high blood pressure following a double bypass for legs and aorta 20 years ago; Plavix as a blood thinner after his stroke; Clobetasol and Propionate ointments for psoriasis: and Metformin, which he felt no longer needed, due to losing weight, for diabetes.  R. 39-40.  To his knowledge, he did not have any side effects from taking these medications.  R. 48.

As for daily activities, Plaintiff testified he watched a lot of T.V., and did a little reading; showered; cooked; and tried to mow the lawn, a chore which required stopping due to blood circulation in his legs, a 25-year problem.  R. 41, 56-57.  Plaintiff acknowledged that, even while working as a painter, he had these circulation problems, and if he looked up at the ceiling, he would get dizzy.  R. 42.  He described pain in his leg from walking, and chest pain which occurred sometimes at night and for which he took self-prescribed aspirin.  R. 42.  He described

---

[2] Plaintiff testified at a later point in the hearing that he was receiving food stamp assistance, but no cash assistance. R. 55.

the chest pain as being more on his right side and occurring when he did something physical like heavy lifting such as moving an old-fashioned T.V.  R. 43.

Plaintiff testified to his belief that he would not have any problem carrying a gallon of milk, but offered no estimate as to how far he could carry a 20 pound bag of potatoes; depending on how far he had to go, he would not have a problem carrying around and balancing a six foot high step ladder with six steps, but could only do so for a couple of steps due to loss of strength from aging.  R. 44-46.  His painting jobs required moving a ladder around the house three or four times, e.g., for prepping, priming, painting, something he did not feel he could do anymore to anybody's satisfaction, and carrying a couple of five gallon cans of paint.  R. 46-47.  Painting also involved using a brush or roller for priming, and engaging in repetitive motions using a disc sander for scraping.  R. 47.

Plaintiff stated that by his choice, he lost 100 pounds after he first had his stroke in 2008, reducing his weight of 245 down to about 145, now.  R. 48-49.  He wanted to see a doctor about the weight loss, and a physical, but didn't have the cash.  R. 49.  Plaintiff also testified that, currently, he smoked a pack of cigarettes a day, starting to smoke again after the "double-by-pass" in his leg and the stroke.  *Id.*

He acknowledged being in substance abuse treatment at Conifer for two months, having been court-mandated there following his misdemeanor conviction of possession of a controlled substance, cocaine, for which he was sentenced to three years of probation.  R. 50-52, 54.  His 82-year-old mother did the cleaning, but Plaintiff cooked their meals, did his own laundry, and drove to a friend's maybe once a month.  R. 56-57.  He did not exercise.  R. 57.  Both arteries in his neck are clogged, causing dizziness, if he looked up too long.  R. 59.

Julie Andrews, Vocational Expert ("VE"), testified that an assumed individual of Plaintiff's age on the date of onset, with a GED education, and the ability to perform a range of

light work with the additional limitations of having to avoid reaching overhead, above the shoulder bilaterally, and capable of jobs requiring three or four steps, would not be able to do the past relevant work of a painter, which was a skilled position with medium exertion. R. 62. Such individual would, however, be able to work as a counter clerk, an unskilled position with light exertion (166,232 national positions and 1,310 regional positions); a small product assembler, also unskilled with light exertion (307,082 national positions and 2,810 regional positions); and order clerk position, unskilled with sedentary exertion (255,000 national positions and 425 regional positions). R. 63-64.

Based upon Plaintiff's testimony that he was in substance abuse treatment at Conifer Park, the ALJ held the administrative record open until October 27, 2011 in order to receive the relevant treatment records. R. 52-53, 72-73. Plaintiff's memorandum of law setting forth any legal arguments regarding significance of Plaintiff's age in the disability determination, as well as any medical background and records to support any "allegations of the ability to limit it to sedentary work" was to be received by this date, as well. R. 74-75.

### C. Medical Evidence

A Strong Memorial Hospital ("SMH") clinic note[3] shows that Plaintiff was seen by his primary care physician, Dr. Judith Allen, on December 6, 2006.[4] Plaintiff reported feeling well and staying active, with no chest pains or shortness of breath, no dyspnea upon exertion, and no leg pain with exertion. R. 205. Dr. Allen performed a physical examination and assessed Plaintiff's hypertension "under decent control," with medication; an increased cholesterol level

---

[3] As Defendant points outs, clinical notes found at R. 206-20, referring to SMH, appear the same as those found at R. 235-61, referring to Southview Internal Medicine University of Rochester Medical Center.
[4] The ALJ appears to have confused the date of this record entry — in his decision he cited statements made by Plaintiff and the medical findings of this date as having been rendered in December 2009. However, the impact of this apparent confusion is minimal given that Plaintiff consistently reported during visits to treating and other medical professionals during visits that he had no chest pain or shortness of breath.

requiring follow up; and peripheral vascular disease as "stable." *Id.* Other physical findings were normal, and Plaintiff was advised to follow up in six months. *Id.*

Ambulatory Progress notes dated March 19, 2008 show that Plaintiff visited Dr. Judith Allen for a checkup and to refill his medications. R. 204. Plaintiff said he still was not smoking and was trying to stay active, but admitted he didn't always watch his diet. *Id.* He reported no chest pain or discomfort, no dyspnea, no light-headedness or dizziness and appeared not to be in acute distress. *Id.* Physical examination findings were normal, and he was advised to continue to work on diet and exercise, as well as to continue smoking cessation. *Id.*

On June 16, 2008, Plaintiff was admitted to Strong Memorial Hospital ("SMH"), presenting with sudden onset of dysarthria[5] and left facial droop, symptoms first noticed by a colleague at work. R. 244. A computer tomography ("CT") scan of the head showed a dense right middle cerebral artery ("MCA") with early ischemic changes to the frontal lobe. R. 206. Magnetic Resonance Imaging ("MRI") of the head showed that Plaintiff, who had no prior history of stroke, had a stroke on the left side of his brain—"a large acute infarction in the right MCA territory." R. 239. Both MRI/Magnetic Resonance Angiography ("MRA") and carotid ultrasound testing revealed blockages of both carotid arteries, but with blood flow maintained to the brain through other vasculature. *Id.* X-rays of Plaintiff's chest revealed no radiographic evidence of acute cardiopulmonary disease. R. 253. Echocardiography and Vascular Imaging showed normal sinus rhythm with possible ischemia. R. 209-213. Other testing showed that Plaintiff had diabetes. R. 239. Plaintiff was treated in the Neurology Department and within 24 hours evidenced improvement in neurological functioning. R. 207. During his hospital stay, Plaintiff reported that he drank six beers a day, but had not smoked in seventeen years. R. 206. On June 19, 2008, at the time of his discharge with prescribed medications to home care,

---

[5] "Dysarthria refers to a condition where one has difficulty controlling or coordinating muscles used for speaking, and is characterized by slurred or slowed speech." ECF No. 12-1, n.1.

Plaintiff ambulated without difficulty, but continued to experience some mild difficulties with his left upper extremity and facial droop, and when talking. R. 207. Plaintiff was instructed to modify his diet due to concerns about elevated blood glucose, to undergo speech and occupational therapy, to follow up with his primary care physician, Dr. Judith Allen, regarding medication needs in the next week, and to follow up with the Neurology Stroke Clinic on July 31, 2008. R. 207-08.

Subsequent to his hospitalization, Plaintiff was seen on June 25, 2008 by Dr. Allen, still presenting with residual left hemiparesis and right facial drooping. R. 235. He indicated that he was not currently working and was set to begin physical therapy the next day. *Id.* They discussed stroke prevention and proper diet. *Id.* He reported some swelling in his left hand which had improved recently; he denied having any chest pain or shortness of breath. *Id.* A physical examination showed that Plaintiff had mild dysarthria, could not lift his left arm above 90 degrees, and had diminished upper left extremity strength. R. 202.

According to the Neurology Stroke Clinic Notes written to Dr. Judith Allen, Plaintiff was seen on July 31, 2008 in the SMH Stroke Center for a follow-up of his recent hospitalization. R. 232. Plaintiff reported having returned to work part-time as a painter and was driving; he was actively participating in physical, occupational, and speech therapy. *Id.* Denying any falls or near falls, Plaintiff indicated that his walking was not quite back to normal. *Id.* While he reported residual symptoms of dysarthria, distal left extremity numbness, and left arm weakness, Plaintiff denied having any active complaints or recurrence of headache, eye, or neck pain, visual field loss, diplopia, vertigo or disequilibrium, or dysphasia. *Id.* Neurologically, Plaintiff was fully alert and oriented, and a physical examination showed no acute distress, but mild dysarthria was present; Plaintiff had full muscle tone and power, and the ability to walk in tandem without difficulty. R. 232-33. According to Dr. David Rempe, laboratory and imaging studies

confirmed an MCA infarction, bilateral ICA occlusions on angiography and carotid duplex, and an elevated LDL and triglycerides. R. 333. A hypercoaguable panel ordered to investigate possible clotting disorders was within normal limits. Plaintiff's medications were adjusted, and he was advised to return for follow-up in three months. R. 233-34.

When Plaintiff appeared for a checkup on August 25, 2008, he reported that he had gone back to work and that he could "climb up and down ladders." R. 200. He reported continuing work on his diet; discussed seeing a diabetes educator; and was working on getting insurance. *Id.* He was not in acute distress and the physical examination revealed no abnormalities. R. 200-201. Dr. Allen counseled Plaintiff about diet and medication compliance and encouraged participation in a graded exercise program. R. 201. Plaintiff was advised to follow up in three months. *Id.*

Clinic notes reflect that on November 14, 2008, Plaintiff appeared for a checkup and reported working and feeling fairly well. R. 198. No new symptoms were reported, other than mild residual weakness; his speech had recovered completely. *Id.* Plaintiff did not appear to be in acute distress, and the physical examination was normal. *Id.* Dr. Allen advised him to return in three months. R. 199.

On February 23, 2009, Plaintiff appeared for a checkup and medication review and reported concerns that his memory wasn't very good causing him to write things down, as well as some continued coordination problems with his left arm, although it did not interfere with work as he was not currently working as a painter due to the slow season. R. 196. The findings upon a physical examination showed no abnormalities, with the exception of psoriasis over the exterior surfaces of his knees and elbows. R. 196-97. Dr. Allen noted that Plaintiff's hypertension was "excellent" on medications and advised a follow-up visit in three months. R. 197.

Clinic notes of May 20, 2009 show that Plaintiff appeared for a checkup and medication review of diabetes and hypertension. R. 194. He reported doing well overall, continuing to work painting and doing light construction. *Id.* While his overall strength since the stroke was not as good, he did not feel unstable or off balance; he denied having any chest pain, shortness of breath, or palpitations. *Id.* The physical examination revealed no abnormalities, with "excellent blood pressure," "decent" cholesterol, and blood "sugar under good control." Dr. Allen advised Plaintiff to continue diet and exercise, and to follow up in four months. *Id.*

Returning to Dr. Allen on April 9, 2010 for his checkup, Plaintiff reported doing reasonably well and denied any chest pain, shortness of breath, increased claudication or increased muscle pain. R. 192. He stated that he was working, though work was slow; he could get around, but noted some weakness and some difficulty climbing. *Id.* Plaintiff reported that he had not been able to take his medications, except for Lipitor. *Id.* The physical examination revealed no abnormal findings, and Dr. Allen advised Plaintiff to have his blood re-checked. R. 192-193.

On June 29, 2010, Dr. Karl Eurenius, an internist, who examined Plaintiff at the Commissioner's request, found Plaintiff's chief complaints to be related primarily to vascular disease. R. 262-65. Particularly, Plaintiff reported intermittent claudication in 1991 resulting in bilateral fem-fem bypasses with good results and no follow-up problems with claudication; a myocardial infarction in 1999 resulting in the placement of a stent, and thereafter, with occasional chest pain and occasional shortness of breath if walking over a half mile, but had not needed to take nitroglycerin for a number of years; a stroke in 2009, from which he almost fully recovered, except for continued problems with his left hand coordination, occasionally dropping objects. He reported smoking a pack of cigarettes a day and drinking beer four times a week.

His reported daily activities included cooking once a week, bathing, and dressing without assistance, watching television, listening to the radio, reading, and socializing with friends.

The physical examination performed by Dr. Eurenius revealed no abnormalities and showed that Plaintiff, 5'5" tall and weighing 151 pounds, had normal gait, could stand on his heels and toes, squat fully, stand normally, used no assistive devices, and needed no help changing, getting on and off table, or arising from a chair. The cervical and lumbar spines showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally; full and equal strength in his upper and lower extremities; brisk and equal deep tendon reflexes; intact hand and finger dexterity; and grip strength 5/5 bilaterally. Upon diagnosing arteriosclerotic vascular disease with a history of myocardial infarction with stent placement, intermittent claudication with fem-fem bypass bilaterally, cerebrovascular accident or transient ischemic attack with documented clogged carotid arteries, and psoriasis, Dr. Eurenius opined that Plaintiff was limited in exertional activities due to chest pain on exertion, but was not limited in non-exertional activities.

In compliance with court-mandated substance abuse treatment at Conifer Park due to a conviction for possession of a controlled substance, Plaintiff was interviewed on August 9, 2011 and admitted on August 15, 2011.[6] R. 283-99. The intake evaluation shows that Plaintiff's mental status was normal; he was able to comprehend and understand materials presented and participate in the treatment process; had no physical or psychiatric conditions that would interfere with treatment; and was not a risk to self or others. R. 283-84. Plaintiff stated during the intake process that once or twice a week he drank five beers and last drank on July 22, 2011, but had not smoked cocaine in the last 30 days. R. 288.

---

[6] As Defendant points out, the Conifer Park records at R. 283-99 appear the same as those at R. 300-23.

## III.   DISCUSSION

### A.  Scope of Review

On appeal, this Court's role is to determine "if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see also* Title 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...."). It is not this Court's function to "determine *de novo* whether the [plaintiff] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (citation omitted). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Burgess v. Astrue*, 537 F.3d 117, 127-128 (2d Cir. 2008) (citing *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### B.  Fed. R. Civ. P. 12(c) Standard

Rule 12(c) permits a party to move for judgment on the pleadings "after the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). In deciding a Rule 12(c) motion, a court employs the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6). *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (per curiam). A court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Id.* To withstand a motion for judgment on the pleadings, a court must determine whether the "'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* at 161 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Thus, granting judgment on the pleadings is only appropriate when, after reviewing the record, the court is convinced that the

Plaintiff has failed to set forth a plausible claim for the requested relief based on the evidence presented. *See generally Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

### C.  Standard for Eligibility for SSI

The SSA provides that an individual shall be considered disabled if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  An individual will be determined to be disabled only upon a demonstration that his or her physical impairment(s) are of such severity as to preclude him or her from not only performing his or her previous work but, considering his or her age, education, and work experience, from engaging in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B).

In determining whether an individual is disabled, using this definition, the Commissioner must engage in the SSA-created five-step sequential evaluation process outlined in 20 C.F.R. § 416.920.  The Commissioner must consider, in order: (1) the individual's work activity (20 C.F.R. § 416.920(a)(4)(i)); (2) the medical severity of the impairment(s) and that it meets the duration requirement in § 416.909 (20 C.F.R. § 416.920(a)(4)(ii)); (3) the medical severity of the impairment(s) and that it meets or equals the listings criteria in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(a)(4)(iii)); (4) an assessment of the individual's residual functional capacity and past relevant work history (20 C.F.R. § 416.920(a)(4)(iv)); and (5) an assessment of the individual's residual functional capacity and age, education, and work experience to see whether he or she can make an adjustment to any other type of work (20 C.F.R. § 416.920(a)(4)(v)).

The required analysis is as follows:

> First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity.   Where the
> claimant is not, the Commissioner next considers whether the
> claimant has a "severe impairment" that significantly limits her
> physical or mental ability to do basic work activities.   If the
> claimant suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an impairment
> that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant
> has a listed impairment, the Commissioner will consider the
> claimant disabled without considering vocational factors such as
> age, education, and work experience; the Commissioner presumes
> that a claimant who is afflicted with a listed impairment is unable
> to perform substantial gainful activity.   Assuming the claimant
> does not have a listed impairment, the fourth inquiry is whether,
> despite the claimant's severe impairment, she has the residual
> functional capacity to perform her past work.   Finally, if the
> claimant is unable to perform her past work, the burden then shifts
> to the Commissioner to determine whether there is other work
> which the claimant could perform.

*Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).  The claimant bears the general burden of

proving that he or she has a disability at steps one through four of the sequential five-step

process, *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), and only when the claimant proves

that he or she cannot return to his or her prior work, at step five, does the burden shift to the

Commissioner to prove the existence of alternative substantial gainful work in significant

numbers in the national economy which claimant can perform, considering his or her physical

and mental capabilities, age, education, experience and training.  *Berry v. Schweiker*, 675 F.2d

464, 467 (2d Cir. 1982).

Plaintiff maintains that the final decision of the Commissioner should be reversed for the

following two reasons: the ALJ's decision is not supported by substantial evidence, and the ALJ

erred in refusing to consider Plaintiff's explanation for the absence of medical reports and to

consider records from Conifer Park.  *See* Plaintiff's Memorandum of Law in Support of

Plaintiff's Cross-Motion for Judgment on the Pleadings and in Opposition to Defendant ("Pl.'s

Mem.") (ECF No. 11-1).   I disagree, and find that the Commissioner's determination should be affirmed.

### D. The ALJ's Decision

To begin with, the ALJ followed the sequential five-step analysis for evaluating Plaintiff's claim of disability.  R. 9-16.  At step one, the ALJ found that although Plaintiff had worked after March 31, 2010, the application date, such work did not rise to the level of substantial gainful activity as defined in the regulations (20 C.F.R. 416.971 *et seq*.).  R. 11.  At step two, he found that Plaintiff had the following severe impairments: myocardial infarction, status-post coronary bypass surgery, status post surgical placement of a stent, status-post stroke; drug and alcohol abuse, currently in treatment according to claimant's testimony.  20 C.F.R. § 416.920(c).  *Id.*  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).  R. 11-12.  The ALJ, after careful consideration of the entire record, at step four, concluded that Plaintiff had the residual functional capacity to perform light work[7] with the exception that he was limited to performing tasks with no more than a three to four step process and should avoid reaching above shoulder level with both arms.  R. 12.  Also, at step four, the ALJ found that Plaintiff was unable to perform any past relevant work (20 C.F.R. § 416.965).  R. 14.  Considering Plaintiff's age, education, work experience, and residual functional capacity, at step

---

[7] As defined in 20 C.F.R. § 416.967(b),

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking, standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

five, the ALJ, with the assistance of the VE, found that there were jobs existing in significant numbers in the national economy that Plaintiff could perform; specifically, counter clerk (166,232 jobs nationally and 1,310 regionally), small products assembler (307,082 jobs nationally and 2,810 regionally), and order clerk (255,000 jobs nationally and 425 regionally). R. 15. Accordingly, he concluded that Plaintiff had not been under a disability, as defined in § 1614(a)(3)(A) of the SSA, since March 31, 2010, the date the application was filed. R. 15-16. The Commissioner applied the correct legal standards by engaging in the SSA-created five-step sequential evaluation process outlined in 20 C.F.R. § 416.920.

### E.  Substantial Evidence Supported the Commissioner's Decision

Plaintiff contends that the ALJ's decision that he was not disabled is not supported by substantial evidence because the ALJ incorrectly concluded that he has the residual functional capacity to perform light work.  Specifically, Plaintiff argues that: (1) the ALJ improperly considered his failure to seek medical treatment, that Plaintiff could not afford, as a factor in the RFC; (2) Dr. Eurenius' opinion that Plaintiff is limited in exertional activities due to chest pain on exertion is evidence that Plaintiff cannot do light work; (3) the ALJ only discussed Plaintiff's vascular disease, but failed to discuss either Dr. Allens' diabetes, hypertension, and hyperlipidemia diagnoses, or the memory problems he testified to.  I, respectfully, disagree and find that the ALJ based his decision that the Plaintiff was not disabled upon a record which contained substantial evidence to support the decision.

Regarding the RFC, the ALJ determined that Plaintiff could perform light work with certain limitations — he could only perform tasks with no more than a three to four step process, and he should avoid reaching above shoulder level with both arms. R. 12.  Contrary to Plaintiff's contentions, in determining the RFC, the ALJ clearly reviewed and considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the

15

objective medical evidence and other evidence, based on the requirements of 20 CFR § 416.929 and SSRs 96-4p and 96-7p.  He also considered the opinion evidence as required by 20 CFR § 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

As required by Social Security regulations, the ALJ followed the two-step process for evaluating pain and other limiting effects of symptoms.   20 C.F.R. §§ 404.1529(a), 416.929(c)(3).  First, the ALJ affirmatively determined that the objective medical evidence, *i.e.*, medical signs, laboratory findings, and other evidence showed that Plaintiff suffered from medically determinable impairments which could reasonably be expected to produce his symptoms.   Upon finding that Plaintiff suffered from such impairments, the ALJ then evaluated the intensity, persistence, or limiting effects of the Plaintiff's symptoms to determine the extent to which the symptoms limited his ability to work.  20 C.F.R. § 416.929(c)(1).  In doing so, the ALJ considered all of the available evidence, including the Plaintiff's medical history, medical signs, laboratory findings, his own statements, the treating source and other medical opinions, or other persons about how the symptoms affected Plaintiff.   *Id.*  He, additionally, evaluated whether Plaintiff's statements about his symptoms were not supported by the objective medical evidence, *i.e.*, suggesting a higher level severity than shown by the medical evidence, considering the other evidence and making a credibility assessment based upon the entire record. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

It is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of the witnesses," including with regard to the severity of a claimant's symptoms.  *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).  Based upon the specific reasons offered by the ALJ for his finding on credibility and the wealth of supportive evidence in the record, I conclude that the ALJ ably resolved the evidentiary conflicts and reasonably appraised the credibility of the witnesses.  The decision set

forth specific reasons for his finding on credibility, supported by the evidence in the case record, and was sufficiently specific to make clear the weight he gave to Plaintiff's statements and the reasons for doing so. *See* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). No grounds for remand exist where "the evidence of record permits [a court] to glean the rationale for the ALJ's decision." *Monguer v. Heckler*, 722 F.3d 1033, 1040 (2d Cir. 1983).

Here, upon considering all evidence, the ALJ found Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms not credible to the extent they were inconsistent with RFC assessment and inconsistent regarding matters relevant to disability issues. R. 12, 13. Despite Plaintiff's subjective complaints of memory problems following stroke, and a reported long history of cardiac problems, it was more than reasonable for the ALJ to regard Plaintiff's statements regarding symptomatology as unsupported by the longitudinal medical record. In this regard, the ALJ found that Plaintiff reported smoking a pack of cigarettes a day and drinking beer four times a week; he also engaged in the daily activities of cooking, bathing, and dressing without assistance, watching television, listening to the radio, reading, and socializing with friends. R. 13. He continued to work as a painter after the alleged onset date. *Id.* Moreover, two-months prior to the hearing, Plaintiff began court-mandated substance abuse treatment following his arrest for possession of a controlled substance. *Id.*

The ALJ found that Plaintiff's chief complaint, vascular disease, started with intermittent claudication in 1991 resulting in bilateral fem-fem bypasses, with good results and no follow up problems with claudication; and a myocardial infarction in 1999 resulting in the placement of a stent, and thereafter, with alleged occasional chest pain and occasional shortness of breath, for which Plaintiff did not need to take nitroglycerin. R. 13.

Reviewing Plaintiff's statements in light of all of the medical evidence in the record, the ALJ observed that in June 2008, Plaintiff suffered a diagnosed stroke for which he was admitted

to SMH and had left-sided weakness, requiring occupational therapy.  The follow-up treatment visits and Plaintiff's statements made thereat, reflect inconsistencies regarding his claimed disability: in July 2008 a visit to his primary treating physician who documented continued left-side weakness, even with which, Plaintiff had returned to part-time work as a painter and could drive; in November 2008, at a checkup visit, Plaintiff reported that he returned to full-time work as a painter; a return visit to SMH in February 2009, reporting memory problems and some left-arm coordination issues which did not interfere with his work due to a slow season; a May 2009 visit with reports that he was doing well, continued to work as a painter and in light construction and with no complaints of chest pain, shortness of breath, palpitations, instability or imbalance; a return visit to Dr. Allen in April 2010 stating that work was slow and he could not get his medications, but denied chest pain or shortness of breath.   While noting the absence of treatment notes since Plaintiff's admission to Conifer Park for court-mandated substance abuse treatment due to his conviction for possession of cocaine, the ALJ did consider the August 2011 intake evaluation during which Plaintiff stated that he drank five beers once or twice a week and last drank on July 22, 2011 and smoked cocaine, but not in the last 30 days; and presented with a Global Assessment Functioning ("GAF") score of 62, indicating some mild symptoms.  R. 299.

The ALJ properly found that, with the exception of Plaintiff's reports to Dr. Eurenius, the objective medical record clearly showed that Plaintiff consistently denied chest pain and shortness of breath, not only to his treating physician prior to his stroke, but during his 2008 hospitalization for facial droop and stroke diagnosis, and during follow-up medical visits, as well.

Upon review, I disagree that in arriving at the RFC determination, the ALJ improperly assessed Plaintiff's statements to Dr. Allen and Dr. Eurenius regarding his inability to afford medical care and medications due to a lack of health insurance.  To the contrary, in assessing the

credibility of these statements, the ALJ exercised his discretion to accord more credibility to Plaintiff's own hearing testimony that he did not seek medical treatment because he sought to avoid more debt. Furthermore, the ALJ's statement that Plaintiff had generally not received the type of medical treatment one would expect for a totally disabled individual merely expressed the ALJ's reasonable assessment of the Plaintiff's credibility regarding the intensity, severity, and limiting effects of the pain he described, as compared to the level of medical care reflected in the objective medical record.

Nor did the ALJ commit error by not discussing the other diagnoses of diabetes, hypertension, and hyperlipidemia. R. 224-236. No doubt, these diagnoses appeared as entries in the medical record, but neither these entries, nor Plaintiff's testimony, or any other evidence in the administrative record, disclose any exertional or non-exertional limitations imposed by these conditions on Plaintiff's ability to perform light work as determined by the RFC. Indeed, discussing limitations, Dr. Eurenius opined that Plaintiff had no non-exertional limitations, and the exertional limitations stemmed from reported chest pain and shortness of breath on exertion.

As for opinion evidence, the ALJ accorded great weight to Dr. Allen, Plaintiff's treating physician. Deference to the views of Dr. Allen, pursuant to the treating physician's rule, was proper, *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003), considering, as the ALJ did, that Plaintiff reported almost a full recovery from the stroke as indicated by his return to work and driving, even with some left-side weakness; his hypertension was under control, on medication, and his cholesterol was under decent control; and his repeated denial, on visits to Dr. Allen, of chest pain and shortness of breath, even without his medication. R. 14.

He accorded significant weight to the opinion of consultative examiner Dr. Eurenius. The opinion of a consultative examiner can constitute substantial evidence supporting an ALJ's decision. *Monguer v. Heckler*, 722 F.3d at 1039; *see Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir.

1995).  Even finding that Dr. Eurenius' opinion that Plaintiff was limited in exertional activities

due to chest pain on exertion, but not limited to activities that were non-exertional, was based

upon Plaintiff's subjective complaints of chest pain and shortness of breath, conditions which the

record showed Plaintiff denied to his primary care physician, even without medication, the ALJ

generously found both complaints to be reasonable restrictions for a person with cardiac

complaints.  R. 14.  Notably, the ALJ limited Plaintiff to light work with even more restrictions

than indicated by Dr. Eurenius — tasks with no more than a three to four step process and

avoiding reaching above shoulder level with both arms.

   This analysis clearly demonstrates that substantial evidence in the record supported the

RFC of limited light work.  I, therefore, reject Plaintiff's contentions that an RFC of sedentary

work[8] was mandated by the Medical-Vocational Guidelines because he was 50 years old at the

issuance of the ALJ's decision, qualifying him as a person closely approaching advanced age

(50-54) (20 C.F.R. 1563(d)), and an individual who, with only a GED, had not completed

education required for direct entry into skilled sedentary work.   Notably, Plaintiff, by his

attorney, presented his views on the issue of the significance of his age during the hearing, but

did not seek to amend the alleged onset date to his 50th birthday.  R. 26-28, 74.


   **F.  No Error Occurred Regarding Consideration of Plaintiff's Explanation of the
       Absence of Certain Medical Reports and in the Consideration of Conifer Park
       Records**

   Plaintiff seeks remand for further development of the record to include evidence that he is

now receiving Medicaid and receiving medical treatment and to include treatment records from

---

[8] 20 CFR § 416.967(a) defines sedentary work as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or
> carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as
> one which involves sitting, a certain amount of walking and standing is necessary in carrying out
> job duties.   Jobs are sedentary if walking and standing are required occasionally and other
> sedentary criteria are met.

Conifer Park, on the basis that at the time of the hearing he had only been in treatment for two months.  There is no need for remand for the Commissioner's determination of either issue.

As stated herein above, in arriving at the RFC determination, the ALJ did not improperly assess Plaintiff's statements to Dr. Allen and Dr. Eurenius regarding his inability to afford medical care and medications due to a lack of health insurance.  In any event, to be sure, where there are deficiencies in the record, the regulations place an affirmative duty upon the ALJ to develop a claimant's medical history in the administrative record, even where the claimant is represented by counsel.  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.") (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("an ALJ is under an affirmative obligation to develop a claimant's medical history, 'even when the claimant is represented by counsel ...'")); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'  This duty ... exists even when ... the claimant is represented by counsel.") (citations omitted) (alterations in the original).

In his letter submitted to the ALJ on November 9, 2011, Plaintiff's attorney referenced the enclosed reports from Conifer Park, specifically, declaring therein that "there is no evidence that alcoholism or drug addiction is a contributing factor material to a determination that [Plaintiff] is disabled, the fact that he is being treated at Conifer Park should not disqualify from receiving SSI benefits.  *See* 42 USCA 423(d)(2)(C)."  R. 271.  Here, the Conifer Park records provided to the ALJ consisted of intake evaluation information only, and Plaintiff offered no explanation for the failure to include any actual substance abuse treatment notes.  No error is detected on the part of the ALJ in refusing to consider the intake evaluation as evidence of

treatment notes, as Plaintiff suggests.  Had he done so, the ALJ, unreasonably and without an evidentiary basis therefor, would have engaged in unwarranted speculation about the nature, type, and extent of substance abuse treatment being provided, as well as Plaintiff's participation or engagement in such treatment, based solely upon an indicated need for treatment.  Moreover, this evaluative information shed no light whatsoever regarding any limitations caused by his substance abuse on Plaintiff's functioning or ability to work.  There was no evidence that the medical record was deficient, therefore, no supplementation of the record was required.

Finding that Plaintiff, a 48 years old at the time he applied, with at least a high school education and able to communicate in English, could not perform past relevant work and his ability to perform all or substantially all of the requirements of light work had been impeded by additional limitations, and in order to determine the extent to which such limitations "erode[d] the unskilled occupational base," the ALJ asked the testifying VE whether jobs existed in the national economy for a hypothetical claimant with Plaintiff's age, education, work experience, and residual functional capacity.  R. 15.  Based upon the VE's testimony that unskilled jobs, namely, counter clerk, small products assembler, and order clerk, existed in the national economy for an individual presenting with Plaintiff's factors, the ALJ concluded that Plaintiff was capable of making a successful adjustment to other work existing in significant numbers in the national economy and, consequently, a finding of disabled was not appropriate.  R. 15.

I agree with this finding.  Therefore, for the reasons set forth herein above, the Court rejects Plaintiff's arguments for reversal of the Commissioner's decision denying Plaintiff SSI because he was not disabled since March 31, 2010.

## IV.    CONCLUSION

For all of the foregoing reasons, and after careful consideration of the entire record, I find that the Commissioner's determination was supported by substantial evidence in the record and

was not erroneous as a matter of law.   Accordingly, the Commissioner's determination is affirmed.  The Court hereby GRANTS Defendant's Motion for Judgment on the Pleadings (ECF No. 12) and DENIES Plaintiff's Motion for Judgment on the Pleadings (ECF No. 11).  The Court orders that Plaintiff's Amended Complaint (ECF No. 5) be dismissed, and the Clerk of the Court is directed to close Civil Case No. 13-CV-6408.

IT IS SO ORDERED.

Dated: January 29, 2015
       Rochester, New York

HON. FRANK P. GERACI, JR.
United States District Judge